**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**STATESBORO DIVISION**

| | | |
|---|---|---|
| C. DOUG COLLINS, III, as Administrator of the Estate of AUREON SHAVEA GRACE, deceased, and as Conservator of K.L.G. and A.B.W., minors, | ) | CIVIL ACTION NO. 6:26-CV-56 |
| *Plaintiff*, | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| JACOB BEASLEY, individually; RODNEY FOULKS, individually; CHRISTOPHER WRIGHT, individually; JUSTIN M. FOUNTAIN, individually; | ) | |
| *Defendants*. | ) | |

**<u>COMPLAINT</u>**

Plaintiff C. Doug Collins, III, as Administrator of the Estate of Aureon Shavea Grace and as Conservator of her minor children K.L.G. and A.B.W., files this Complaint against Defendants and shows the Court as follows:

## I. PARTIES, JURISDICTION & VENUE

1. Aureon Shavea Grace died on June 16, 2024, in Tattnall County, Georgia. She died intestate and unmarried. She was survived by two minor children, K.L.G. (born 2020) and A.B.W. (born 2022), who are identified by initials pursuant to Fed. R. Civ. P. 5.2(a)(3).

2. Administration of the Estate of Aureon Shavea Grace commenced on October 30, 2024, when Deshonda Hagins was appointed as Administrator by the Probate Court of Bulloch County (Estate No. 24-DE-176). On July 16, 2025, that Court appointed Plaintiff C. Doug Collins, III as successor Administrator. He brings the survival claims in that capacity pursuant to O.C.G.A. §§ 9-2-41 and 51-4-5(b), as incorporated through 42 U.S.C. § 1988. Under O.C.G.A. § 9-3-92, the

period between Grace's death and the commencement of administration is not counted against the Estate in computing any limitation period applicable to the Estate's claims.

3. Plaintiff Collins was also appointed permanent Conservator of K.L.G. and A.B.W. on August 11, 2025 (Estate Nos. 24-MGC-177 and -178). He brings the wrongful-death claims on the children's behalf under O.C.G.A. § 51-4-2, as incorporated through 42 U.S.C. § 1988. Under O.C.G.A. § 9-3-90(a), the limitation period applicable to children's claim is tolled during their minority.

4. Ms. Grace was the victim of a crime. The criminal investigation into her death by Georgia Department of Correction's Criminal Investigations Division remains open, and a criminal prosecution arising from the smuggling of the firearm used to kill her, *State v. Damien Rashad Chance, Terrence Andrius Hanna, Dequan Shakale Holmes, Sharika Chyenice Jackson, and Jeffery Mickael Jones*, No. 2026-R-59-MH, is pending in the Superior Court of Tattnall County. Under O.C.G.A. § 9-3-99, the limitation period applicable to Plaintiff's claims has been tolled from June 16, 2024, and remains tolled until that prosecution is finally terminated.

5. Defendant Jacob Beasley was at all relevant times the Warden of Smith State Prison. As Warden he had final on-site authority over lockdowns, institutional searches, inmate movement and job assignments, security staffing and post assignments, and supervision of the food-service area. He is sued in his individual capacity.

6. Defendant Rodney Foulks was at all relevant times the Deputy Warden of Security at Smith State Prison, responsible for security operations, contraband interdiction, post staffing, and inmate movement control. He is sued in his individual capacity.

7. Defendant Christopher Wright was at all relevant times a Lieutenant at Smith State Prison and was the ranking security officer on duty during the shift on which Ms. Grace was killed. He is sued in his individual capacity.

8. Defendant Justin M. Fountain was at all relevant times a Special Agent of the Georgia Department of Corrections, Criminal Investigations Division. He was assigned to the Division's investigation of a contraband-smuggling network operating into Smith State Prison, during the

period the firearm described below was inside the prison. He is sued in his individual capacity.

9. At all relevant times each Defendant was employed by GDC and acted under color of Georgia law.

10. This action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

11. Venue is proper under 28 U.S.C. § 1391(b).

## II. FACTUAL ALLEGATIONS

12. Smith State Prison in Glennville, Tattnall County, is a close-security facility operated by Georgia Department of Corrections (GDC). GDC's published classification standard defines close-security offenders as those who "never leave the prison" and "require constant supervision by a Correctional Officer."[1] (Exhibit A.)

13. Food service at Smith State Prison was operated by Aramark Correctional Services, LLC under Contract No. 46700-019-GDC0000990-0001 (the "Food Service Contract"), which was extended to Smith by Amendment No. 5 effective October 1, 2023. (Exhibit B.) Under that contract GDC undertook a specific staffing obligation: "GDC will supply one Correctional Officer per shift to control offender movement in and out of the kitchen area." Scope of Work § 25. GDC-approved staffing plans "will be used to determine daily kitchen posts that must be filled." § 20. Responsibility for controlling inmate movement remained with GDC. § 19; Att. 1 § G.1(iv).

14. GDC's own food-service security policy is to the same effect. Under SOP 409.04.11, security procedures "will be adopted to ensure the safety of staff and offenders" in the kitchen, written post orders govern "[o]ffender traffic within and in-and-out of food service areas," and a "kitchen officer" must be present at every shift change to witness the tool inventory. §§ I.C, IV.H, IV.I.3.

15. GDC policy bars civilian contractors from carrying "any firearms or other weapons"

---

[1] Under GDC Standard Operating Procedure ("SOP") 220.02, the purpose of the security classification is "ensuring the protection and safety of GDC staff, contractors, visitors, and other offenders," and security classification determines "levels of supervision."

on facility grounds. SOP 205.09 § IV.M. Civilian kitchen workers at Smith were, by GDC rule, unarmed and dependent on the officer GDC had committed to post in the kitchen.

16. GDC officials have ready means to respond when a weapon is reported inside a facility. The Warden, Deputy Warden of Security, Unit Manager, Duty Officer, or Shift Supervisor may immediately place any offender whose presence in general population "poses a serious threat to life, property, self, staff, or other offenders" in administrative segregation pending investigation. SOP 209.06 §§ III.A, IV.A.3, IV.C. The Warden may order a facility lockdown and institutional search at any time.

17. By 2022, GDC was aware of an organized contraband-trafficking enterprise operating inside Smith State Prison that involved GDC staff. In February 2023, then-Warden Brian Adams was arrested and charged in connection with the enterprise. Defendant Beasley was appointed Warden following Adams's removal and served as Warden throughout the period relevant here.

18. GDC's Criminal Investigations Division ("CID") investigated the contraband network at Smith State Prison for approximately two years preceding June 2024. Defendant Fountain was a CID Special Agent assigned to that investigation. The investigation identified Dequan Holmes, an inmate at Smith State Prison serving life without parole and a leader of the Gangster Disciples, as the network's coordinator inside the prison, and identified the outside associates who procured and delivered contraband at his direction. GDC seized multiple contraband telephones from Holmes over the course of the investigation and obtained their contents.

***The Killing of Aureon Grace***

19. Between June 30 and July 10, 2023, a handgun was thrown over the perimeter fence into Smith State Prison by Holmes's outside associates, together with tobacco, clothing, and narcotics, as part of the contraband enterprise. Defendant Fountain has so testified under oath in the Superior Court of Tattnall County. (Exhibit C.)

20. Holmes received and photographed the gun; and a second inmate assigned to kitchen detail concealed it inside the prison kitchen, where it remained for approximately eleven months.

The gun was procured so that Holmes could use it in an escape.

21. After Holmes and the inmate were placed in segregation for contraband violations, the gun was "entrusted" to inmate Jaydrekus Hart and another inmate to keep it "moving around." Photographs of the gun were transmitted from a contraband cellular telephone as early as January 1, 2024.

22. On June 13, 2024, three days before Ms. Grace was killed with the gun, GDC CID confirmed that the firearm was inside Smith State Prison. Defendant Fountain testified: "June 13th of 2024 is when we knew." Fountain personally received or reviewed the June 13 information and understood that the firearm was in the possession of inmates, had been concealed, and was being held for use.

23. On information and belief, Defendant Fountain made a decision to treat the firearm's presence as investigative intelligence to be protected rather than as a security emergency to be addressed, so that the network would not be alerted and CID's sources and intercepted communications would not be compromised.

24. On information and belief, based on GDC's requirement that CID report security threats to the facility Warden, on the gravity of the intelligence, and on CID's on-site presence at Smith State Prison, the June 13 confirmation was communicated to Defendants Beasley and Foulks on or about that day.

25. From June 13 through the early morning of June 16, 2024, Defendants Beasley and Foulks took none of the steps available to them. No lockdown was ordered. No institutional search was conducted. No offender was placed in administrative segregation pending investigation. No additional officer was posted to the kitchen. The civilian food-service workers were not told that a firearm had been confirmed inside the prison. Defendant Fountain, who had days to reconsider the decision, did not request that security measures be taken, and did not cause the civilian employees working in the kitchen to be warned.

26. Jaydrekus Hart was serving a 20-year sentence for voluntary manslaughter and aggravated battery. While housed at Smith State Prison, Hart openly possessed contraband,

including a cellular telephone, designer clothing and jewelry, and food not available to inmates. Hart photographed himself with these items in open areas of the prison, in the presence of correctional staff, and posted the photographs to social media from inside the prison using the contraband telephone. Staff, including Defendants Beasley and Foulks, permitted Hart to possess and display contraband without consequence.

27. Hart was not assigned to the food-service detail and had no authorized reason to be in the kitchen on June 16, 2024.

28. Ms. Grace, then 24 years old, had worked in the Smith State Prison kitchen as an Aramark food-service employee since January 2024. She was unarmed, was not trained or authorized to control inmate movement, and depended entirely on the officer GDC had undertaken to post in the kitchen on her shift. Because Ms. Grace had a metal prosthetic right leg, she was screened by X-ray each day before being admitted to the facility.

29. In the early morning of June 16, 2024, Ms. Grace was working her assigned shift in the kitchen. The only other civilian present was a 19-year-old Aramark employee. No correctional officer was present in the kitchen. The kitchen officer post — the post GDC had contractually undertaken to fill on every shift — was vacant. Defendant Wright, the ranking security officer on duty, knew the post was unstaffed while civilian workers were present and did not fill it. Neither Defendant Wright nor any other officer was in the vicinity of the kitchen.

30. Hart entered the kitchen carrying the firearm. He asked the other inmates present to leave so that he could have the room to himself, and they left. No officer was present to control who entered or left the kitchen.

31. Hart assaulted Ms. Grace, shot her, and then shot himself. Ms. Grace was conscious and aware of the attack before she died; her last words were a plea concerning her children. An inmate, not a correctional officer, was the first to check her pulse.

32. Prison officials did not notify Ms. Grace's family of her death. Her family learned of it from inmates using contraband cellular telephones and arrived at the prison before GDC had contacted them.

33. Within a day of the killing, GDC publicly stated that a "personal relationship" had existed between Ms. Grace and Hart, and that the shooting was an "isolated incident." GDC did not disclose that its investigators had confirmed the presence of the firearm three days earlier, that the gun had been inside the prison for nearly a year, or that the gun reached Hart through other inmates as part of a contraband enterprise allowed to operate under CID investigation.

34. The killing prompted a same-day lockdown of every GDC facility in the State, the closure of roads leading to Smith State Prison, and an announcement by the Governor of an independent assessment of the corrections system. These measures had been available to Defendants for the preceding year, including on June 13 when Defendant Fountain confirmed the firearm was inside the prison.

35. Defendants' conduct was not a failure to protect a civilian. With actual knowledge that a firearm was inside a close-security prison and had been moved around, Defendants made affirmative choices: (i) to forgo the search, lockdown, and segregation that GDC policy provides for; (ii) to leave vacant the kitchen post that GDC had contractually undertaken to fill on every shift; (iii) to permit an inmate with no assignment to the kitchen to enter it unchallenged; and (iv) to send unarmed civilians into that kitchen without warning them.

36. Those choices created a specific and foreseeable danger to a discrete and identifiable group — the unarmed civilian food-service workers who would be in the Smith State Prison kitchen alone. That danger was distinct from any danger faced by the prison population generally. Ms. Grace was a member of each group.

37. Three days elapsed between GDC's confirmation of the firearm and Ms. Grace's death. Defendants had the opportunity for unhurried deliberation and chose inaction.

38. No reasonable official in any Defendant's position could have believed that leaving unarmed civilians in a close-security kitchen without any correctional supervision, while knowing that a firearm was loose in the facility, was constitutionally permissible.

## III. CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 — Fourteenth Amendment Substantive Due Process (Wrongful Death)

39. Plaintiff incorporates the factual allegations in Paragraphs 5 through 9 and 12 through 38 as if fully set forth herein.

40. Aureon Grace had a liberty interest, protected by the Due Process Clause of the Fourteenth Amendment, in her life and bodily integrity.

41. Each Defendant acted under color of state law. Each held a position in which GDC vested authority over lockdowns, searches, inmate classification and movement, post assignments, or the handling of security intelligence at Smith State Prison, and each exercised that authority in the conduct alleged below.

42. This claim rests on affirmative decisions each Defendant made with actual knowledge of a firearm inside a close-security prison.

43. Defendant Fountain, having received the June 13, 2024, confirmation that the firearm was inside the prison, in inmate hands,

(i) decided to treat that confirmation as investigative intelligence to be protected rather than as a security threat to be eliminated; and

(ii) in furtherance of that decision, communicated the confirmation to Defendants Beasley and Foulks together with a direction that no lockdown, search, or segregation be undertaken.

Each of these was a deliberate exercise of CID's authority over the handling of security intelligence, made with time to deliberate, and each had the effect of causing Smith State Prison to continue operating and its civilian staff to keep reporting to work.

44. Defendant Beasley, with knowledge of the June 13, 2024 confirmation,

(i) decided to keep Smith State Prison on normal operations through June 16;

(ii) decided against the institutional search and administrative segregation that GDC

policy placed at his disposal;

(iii) posted no additional officer to the kitchen when the officer post was not covered;

(iv) permitted Hart's contraband possession and unrestricted movement; and

(v) kept the civilian food-service workers on their regular schedule without warning them.

Each of these was a deliberate exercise of the Warden's authority made with time to deliberate.

45. Defendant Foulks, with the same knowledge,

(i) carried out the decision to remain on normal operations;

(ii) directed no contraband-interdiction resources to the kitchen or to Hart's housing unit;

(iii) gave shift supervisors no instruction to post additional officer when the kitchen officer post was vacant; and

(iv) continued to permit Hart's unrestricted movement.

Each of these was a deliberate exercise of the Deputy Warden of Security's authority over post staffing and inmate movement.

46. Defendant Wright, as the ranking security officer on duty on the morning of June 16, knew that the kitchen officer post was vacant while two civilian workers were in the kitchen with inmates and chose not to fill it, either by assigning an officer to it or by standing the post himself. He also chose to remain away from the vicinity of the kitchen during the shift.

47. Each Defendant's decisions were made with actual knowledge of a specific, extremely great risk of serious injury to the civilian workers in the kitchen. Defendants knew of this gun, knew it had been in the prison for nearly a year, and knew it was moving among inmates.

48. Each Defendant's decisions were arbitrary and conscience-shocking in the constitutional sense. They were deliberate choices that took an unarmed civilian who depended entirely on GDC officers for her safety and left her without any officer in a kitchen that an armed inmate could enter unchallenged.

49. Each Defendant's decisions were a proximate cause of Ms. Grace's death. Hart's act was the foreseeable consequence of a vacant kitchen post, unrestricted inmate movement, and a facility left on normal operations with a confirmed firearm inside it. Defendant Fountain's decision was the reason the facility remained on normal operations after June 13; had the confirmation been handled as a security threat, the lockdown, search, and segregation that followed the killing would have preceded it.

50. It was clearly established at the time that a state official violates the Fourteenth Amendment when, with actual knowledge of an extremely great risk of serious injury to an identifiable person, he makes a deliberate decision that exposes that person to the risk without any justification.

**COUNT II: 42 U.S.C. § 42 U.S.C. § 1983 — Fourteenth Amendment**

**Substantive Due Process (Survival Claim)**

51. Plaintiff incorporates the factual allegations in Paragraphs 5 through 9 and 12 through 38 as if fully set forth herein.

52. As a direct result of the conduct alleged in Count I, Ms. Grace experienced terror and conscious physical pain from the time Hart cleared the kitchen and assaulted her until her death. She was aware of the attack, and aware that she was dying; her last words were a plea concerning her children.

53. Her estate incurred funeral, burial, and related expenses.

54. The estate is entitled to compensatory damages for Ms. Grace's pre-death fright, shock, and pain and for those expenses, and to punitive damages against each Defendant in his individual capacity.

## IV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully prays that the Court:

(a) enter judgment in Plaintiff's favor against each Defendant, jointly and severally, on Counts I and II;

(b) award compensatory damages to the Estate and to the Conservator on behalf of K.L.G.

and A.B.W. in amounts to be determined by the jury;

(c) award punitive damages against each Defendant;

(d) award attorney's fees and costs under 42 U.S.C. § 1988;

(e) award pre- and post-judgment interest as allowed by law; and

(f) grant such other relief as the Court deems just.

This13th day of October, 2026.

*/s/ Brent J. Savage*
Brent J. Savage
Georgia Bar No. 627450
Tania D. Groover
Georgia Bar No. 127947

SAVAGE, TURNER, PINCKNEY,
SAVAGE, SPROUSE & GILLULY
102 E. Liberty St.
Savannah, GA 31401
P.O. Box 10600
Savannah, GA 31412
Phone: (912) 231-1140
Fax: (912) 232-4212